**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEREMY ARIS MÉNDEZ-RODRÍGUEZ<br><br>Defendant. | CRIMINAL NO.  24-402 (GMM)(HRV) |

**REPORT AND RECOMMENDATION**

### I.    INTRODUCTION

On October 8, 2024, the defendant Jeremy Aris Méndez-Rodríguez (hereinafter "Méndez" or "Defendant") was arrested during a police intervention at La Perla Ward in San Juan. The Grand Jury has returned a six-count Indictment charging him with possession with intent to distribute cocaine, cocaine base, and marijuana in violation of 21 U.S.C. § 841(a)(1) (Counts Four, Five and Six); as well as possession of a machinegun in violation of 18 U.S.C. § 922(o) (Count One); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and possession of a machinegun in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1(B)(ii) (Count Three). (Docket No. 11). Méndez moves to suppress the evidence seized. (Docket No. 50). The Government opposes. (Docket No. 55).

The presiding District Judge referred the matter to me for report and recommendation. (Docket No. 51). I held an evidentiary hearing on August 15, 2025.

(Docket No. 67). For the reasons outlined below, I recommend that the motion to suppress be GRANTED in part and DENIED in part.

## II.    PROCEDURAL BACKGROUND

The Government carries the burden of proof because the searches that led to the seizure of the firearm and the controlled substances at issue were warrantless. *See United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017). During the suppression hearing, the Government presented the testimonies of four witnesses: Agent Henry Villa-González (hereinafter "Villa-González"), Sergeant Manuel Torres-Ramírez (hereinafter "Torres-Ramírez"), Agent Kevin Cardé-Rosado (hereinafter "Cardé-Rosado") and Agent Manuel Pagán-Rojas (hereinafter "Pagán-Rojas"), all from the Puerto Rico Police Bureau.

The parties stipulated several exhibits, including photographs taken by the Government of the locations where the Defendant was allegedly pursued on foot and the abandoned structure where he was subsequently arrested in. (Docket No. 71). The photos were not taken on the day of the events but months after, on July 14, 2025. According to Villa-González and Torres-Ramírez, the police usually does not take pictures of the area when they conduct arrests and for safety reasons. (Suppression Hearing Transcript "Tr.", Docket No. 70 at 80, 120).

Before beginning the presentation of evidence, I addressed a motion in limine filed by the Government during the morning hours on the day of the hearing regarding impeachment. (Docket No. 60). I ruled that it was premature to make a ruling and that I would consider the issue as it surfaced during the hearing. Subsequently, I mooted the motion in limine. (Docket No. 63).

2

During the hearing, the defense raised an issue with respect to Fed. R. Crim. P. 26.2 materials. Defense counsel argued that they had not received notes that Agent Villa-González took on his cell phone. However, the notes were later produced. I ordered that Agent Villa-González continue to be under the rules of the Court should the need to recall him as a witness arose regarding the content of the notes. However, the defense did not request to recall agent Villa-González. (*See* Docket Nos. 61, 62). At the conclusion of the hearing, I granted the parties a term of 20 days after receipt of the transcript, to submit post-hearing memoranda. They have complied (Docket Nos. 72 and 73).

After considering the written submissions of the parties, the evidence presented at the suppression hearing, and the post-hearing memoranda filed, I know propose that Court adopt the following

### III.    FINDINGS OF FACT

1.    Agent Villa-González has been a PRPD agent for 4 and a half years. (Tr. 16). He was initially assigned to the Loiza Street precinct and then moved to the San Juan Intelligence Unit about a year ago. (Tr. 17). He investigates all types of crimes, such as assault, fraud, domestic violence and threats and has received extensive training. (Id.).

2.    As an intelligence officer, he handles confidential investigations for controlled substances and firearms. (Tr. 18). In addition to his own cases, he has assisted fellow officers in around 15 to 20 other cases. (Id.). However, this was his first time participating in a case as a plain clothes officer for the intelligence division. (Tr. 43).

3.    On October 8, 2024, Villa-González started service at the general headquarters in the intelligence division. (Tr. 19). Torres-Ramírez, his supervisor, gave instructions regarding a work plan relaying that they were going impact high criminal incidence areas, such as La Perla Ward. (Id.). The work plan was verbally communicated by Torres-Ramírez. (Id.). As was customary, the work plan was only communicated verbally at first. Only if an arrest was made, or drugs were seized, would the agents get a printed out copy of the work plan. (Tr. 117).

4.      The work plan came about because there had been a murder at La Perla and the PRPD wanted to gather intelligence at the known drug point located in Lucila Silva Street. (Tr. 21).

5.      Villa-González's role that day was to conduct surveillance and perform arrests at La Perla. He was assigned to an unmarked grey 2022 Jeep Compass and rode with Pagán-Rojas and Torres-Ramírez. (Tr. 47-48). They were all in plain clothes. (Tr. 48).

6.      As part of the work plan, there were other officers in different vehicles. The purpose of the intervention was to arrive undetected. (Tr. 49).

7.      The written work plan does not mention Méndez and does not indicate that there had been any specific confidential information regarding him. (Tr. 46).

8.      Agent Villa-González testified that, at the time, he was not familiar with the streets and alleyways of La Perla. (Tr. 85).

9.      Soon after entering La Perla, the agents went down Callejón de los Cuernos[1] and reached Lucila Silva Street. (Tr. 51). At that point, Villa-González heard on the radio: "Running, running" while he was still inside his car. (Tr. 22). He stepped out of the car between Lucilla Silva Street and Matadero alley and started walking towards the alley from east to west. (Tr. 23).

10.      Although Villa-González was in plain clothes, he was wearing his Puerto Rico Police issued identification around his neck. (Tr. 25). His firearm was concealed inside his pants in a holster in his waist. (Tr. 48).

11.      Shortly after, Villa-González observed a man about 20 feet away at Callejón de los Cuernos running in his direction but slowing down. (Tr. 23). The agent described the individual as olive skin, with black hair and beard, wearing a long sleeve shirt with black shorts. (Id.). He identified Méndez in court as the individual he saw that day. (Tr. 24).

12.      Agent Villa-González's testimony was that the Defendant was running towards him with a Ziplock bag in his hand with what appeared to be a white powder. (Id.).

13.      He further testified that he does not recall seeing anyone else around. (Tr. 65-66). Pagán-Rojas, however, testified that there were two people running

---

[1] Although Villa-González originally identified the alley as Callejon Matadero, he later corrected himself and stated that it was in fact called Callejón de los Cuernos. (Tr. 51).

towards them when him and Villa-González saw the defendant for the first time. (Tr. 173-74).

14.    Initially, Villa-González did not mention that he was accompanied by another officer. However, during cross examination, he stated that Pagán-Rojas was with him in the alley when he first saw Méndez. (Tr. 87).

15.    Villa-González identified himself as Police and told the Defendant to stop but he kept running, turning left towards some stairs that lead to La Perla boardwalk. (Tr. 24). After seeing that he ignored the halt order, Villa-González kept following Méndez until he caught up to him at an abandoned house that had no doors or windows. (Tr. 25).

16.    The agent also said that you could see the transparent bag on Defendant's hand even as he was running. (Tr. 26).[2]

17.    Villa-González identified the locations of the area where he first saw the Defendant; the pursuit route; and the place where he was arrested through Government Exhibits 1 through 11.

18.    Pagán-Rojas arrived afterwards as Villa-González was placing the Defendant under arrest. According to Villa-González, when he placed the Defendant under arrest, he still had the bag in his hand. Méndez held the drugs on a grip (Tr. 87), which he demonstrated during the hearing. He saw a bulge with white powder that he believed to be cocaine. (Tr. 68).

19.    Villa-González seized the clear bag and conducted a search incident to the arrest after which he seized cash in Defendant's right pocket. (Tr. 26). In his left pocket, Defendant had a small black bag with containers holding pills, known as "rolas" which are similar to LSD. (Id.). Government Ex. 12 is an inventory display and specifically shows (12-B) the bag Méndez was allegedly carrying in his right hand.

20.    After he was placed under arrest, Méndez was transported to the Metropolitan Drug Unit. (Tr. 26). He was read his rights and signed a form attesting to his rights. (Tr. 27). Villa-González took custody of the evidence and transported it to the Drug Unit. (Tr. 28).

---

[2] The credibility of the agent regarding this statement is one of the main issues to be resolved by the Court. As per his own testimony on cross-examination, and based on his training and experience, Agent Villa-González knows that he "need[s] probable cause to arrest somebody." (Tr. at 79). He further testified: "My probable cause was the apparent bag of cocaine that this gentleman had in his hand." (Id.).

21.    An inventory of the seized property was carried out and field tests of the drugs were conducted. The contents of the Ziplock tested positive to cocaine. (Id.). Agent Villa-González was present during the field test, as was Méndez. (Tr. 28-29).

22.    In total, there were 40 cocaine baggies, and pill packs (cylinders) containing 54 pills in different sizes and colors. Photographs were taken of the seized items. (Tr. 28; Gov. Exhibits 12-13).

23.    Villa-González drafted a report regarding the incident. The report does not indicate that he received the "running, running" radio alert; nor does it mention that Pagán-Rojas was with him when he saw the Defendant running down the alley. (Tr. 56).

24.    After processing the evidence seized, the case was consulted with ATF. (Tr. 29).

25.    The second witness to testify was Sergeant Torres-Ramírez, who has been an officer for 15 years and is now with the San Juan Intelligence Division. (Tr. 116). His duties include being a supervisor in cases involving murder, drug trafficking, weapons, and theft. (Id.). He has worked around 900 cases, both directly and indirectly. (Id.).

26.    On the day of the events, he was the supervisor at the San Juan Intelligence Division. (Tr. 117). He confirmed that he prepared a work plan to lift intelligence and carry out surveillance at La Perla because they were investigating a murder. (Id.).

27.    The morning of the events, he discussed the plan with his staff and assigned about eight to ten agents to carry out the work plan. (Tr. 118-19). Several agents were in plain clothes and unmarked vehicles and other agents were there on marked police vehicles. (Tr. 123-24). They were armed and carried their IDs, but not their badges. (Tr. 125). Torres-Ramírez, however, usually wears his metal badge, even if he's not in uniform. (Id.).

28.    The work plan resulted in the arrest of one person and the seizure of controlled substances and a firearm. (Tr. 119).

29.    Torres-Ramírez indicated that he only saw Méndez after he was arrested. (Tr. 126). He never saw him running or committing a crime and he was not present at the time of his arrest or when the firearm was recovered. (Tr. 126, 128).

30.    During the intervention, the Technical Services Unit was not called to take pictures. (Tr. 120). As supervisor, Torres-Ramírez is the one who decides whether to call Technical Services to take pictures during an intervention. (Id.). At the time,

6

he believed that it was risky to have Technical Services there and that the risk was not worth it. (Id.).

31.     Torres-Ramírez further explained how the drug organization at La Perla operates. (Tr. 120-122)) Users of controlled substance go down the stairs and arrive on foot. They may also go down in a car, as if it was a fast food drive thru. (Tr. 121). He explained that if one goes to the left of the bar "La Vergüenza", going down "La Boveda", you get to Lucilla Silva Street, and about 1000 feet in, is the drug point. (Id.). Sellers usually run towards the La Perla Boardwalk (Malecón) when they are trying to escape. (Id.). They flee through the alleys and stash the drugs in fishing tackle boxes or have them in Ziplock baggies. (Tr. 122).

32.     As part of his duties and of the Puerto Rico Police reform, Torres-Ramírez must determine whether an arrest complies with regulations and must fill out Form 615.8. (Tr. 128). The process entails verifying the location where the arrest took place. Torres-Ramírez stated that the Defendant was arrested in one of the back alleys of Lucilla Silva Street. However, he could not provide a street name or GPS coordinate. (Tr. 131-32).

33.     Although they did not take pictures that day, the officers returned with the prosecutors in July of 2025 and, on that day, they also recovered drugs and saw members of the drug points running away. (Tr. 133).

34.     The prosecution's third witness was Cardé-Rosado. (Tr. 137).  He has been an officer for 14 years and has carried around 100 interventions in La Perla. (Id.).

35.     On October 8, 2024, Cardé-Rosado was assigned to carry out surveillance and arrests as per the work plan. (Tr. 138). He positioned himself on the main street of the Malecón area, downhill, at the back of La Perla near the ocean. (Id.).

36.     Once the rest of the agents went into the principal entrance, Cardé-Rosado got out of the car and walked towards the back of Lucilla Silva Street. (Id.). Based on his experience, that is the route that drug sellers use to run from the police. (Tr. 138-39). He was positioned to see if drug sellers or armed individuals came in his direction because, in his experience, drug dealers throw firearms and drugs in the alleyways. (Tr. 139).

37.     As Cardé-Rosado went up some stairs, he saw a closed red bag (Exhibit 30) among the waste, garbage and debris inside an open, abandoned structure in ruins. (Tr. 143-44; Stipulated Exhibits 16, 20-21, 28-38). He was alone when he spotted the backpack. There was no one around and no vehicles or motorcycles nearby. (Tr. 144). The structure was only accessible via pedestrian access, and he does not know who the owner is. (Tr. 151).

38.    The sighting of the bag "intrigued" Cardé-Rosado and aroused his suspicion because it is common to find discarded property in the area, such as bags, fanny packs and transparent fish tackle boxes containing controlled substances. (Tr. 144-45, 154). People usually leave contraband and return for it later. (Tr. 150).

39.    Agent Cardé-Rosado did not have to enter the remains of the abandoned structure, because the bag was visible; he simply stretched his hand and grabbed it. (Tr. 151).

40.    Upon opening the bag, he saw, among other things, drugs, a firearm, a social security card, a driver's license, and passport belonging to Méndez. (Tr. 150).

41.    Cardé-Rosado had not seen the Defendant before finding the bag. In fact, he did not even know he had been arrested. (Tr. 155). It wasn't until he went up to the main street of La Perla after seizing the backpack that he learned someone had been arrested. (Id.). He was also unaware at the time of the finding that the backpack had been recovered on the route that Defendant took while running from the police. (Tr. 160).

42.    Cardé-Rosado did not take a picture of the bag when he found it because, according to him, it was just a finding. (Tr. 152). He did not know what was inside until after he opened it. (Tr. 155). He did not interview or speak to the Defendant because Méndez was not his arrestee. (Tr. 156).

43.    Afterwards, Cardé-Rosado notified his supervisor and drafted an Incident Report. (Tr. 163). In the report, however, he did not mention the backpack because according to him, only the contents are important. (Id.; Tr. 166; and Defense Exhibit C).

44.    ATF agents interviewed Cardé-Rosado, and he gave federal agents the approximate coordinates of where he thought the bag was located. (Tr. 156-160). However, he could not provide an exact street name or location because La Perla alleys have no street names and no specific address. (Tr. 160).

45.    The last witness called was Pagán-Rojas. He has been an agent for 15 years and has conducted interventions in La Perla "an endless number of times." (Tr. 169).

46.    On the day of the events, he arrived in an unmarked vehicle with Villa-González and Torres-Ramírez. (Tr. 170). He got out of the vehicle and went down Matadero street towards an alley. (Id.). He ran behind fellow officer Villa-González. (Id.).

47.     As he ran in the alleyway, he saw two people running towards them, both being chased by fellow officer Xavier Rivera. (Tr. 176, 180). The Defendant was one of the men who were running. (Tr. 172). Méndez turned left (which would be to the right of the agents). (Tr. 174). The other person did not turn because Agent Xavier Rivera caught up to and detained him. (Tr. 176).

48.     Pagán-Rojas did not see anything in Méndez's hands, but his visibility was limited because Villa-González was in front of him. (Tr. 174).

49.     The distance between where they were and where Méndez was when they first saw him was over 60 feet. (Tr. 179).

50.     He assisted Agent Xavier Rivera first and then followed Villa-González down the alley. (Tr. 180). Pagán-Rojas eventually arrived at the structure full of garbage where Méndez was "hiding" as he put it. (Tr. 173).

51.     Pagán-Rojas looked inside the opening to the structure that is depicted in Exhibit 28 (Tr. 181, 183) but did not see anything that called his attention. (Tr. 183). The purpose of looking into the hole was to see if fellow officer Villa was there, but when he did not see Villa, he continued. (Tr. 184).

52.     When he next saw Villa-González, the latter was holding Méndez and that's when he saw Méndez was holding a transparent sandwich bag with cocaine inside. (Tr. 174). When Pagán-Rojas arrived at the location, Méndez was not handcuffed yet. (Id.). Pagán-Rojas never saw Méndez with a backpack. (Tr. 182).

## IV.    APPLICABLE LAW AND DISCUSSION

Méndez contends that the PRPD agent did not have reasonable suspicion to stop him, nor probable cause to arrest him. In advancing this claim, he says that he is a resident of La Perla Ward, that La Perla is not a high-crime area, and that he did not run from the police. (Docket No. 50).[3] Méndez further claims that he did not have anything

---

[3] At the evidentiary hearing, Méndez abandoned most of these arguments. (Counsel Carrion asked: "Q. And you would agree with me that La Perla is considered a high crime area.", Tr. 153.). Also, during the suppression hearing, Méndez did not attempt to controvert the version of the Government that he ran from the police.

in his hands when a Puerto Rico police agent arrested him. He also argues that he did not abandon his backpack and, thus, the police unlawfully seized it and searched it.[4]

The Government responds that the observations of agent Villa-González and his reasonable belief that he had observed an illegal act of drug possession, gave rise to probable cause to arrest Méndez and conduct a warrantless search of his person incident to the arrest. The Government also posits that suppression of the contents of the backpack is not warranted because Defendant abandoned his property.

## A.    Legal Standard

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. A criminal defendant seeking to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation occurred, which in turn encompasses the burden of establishing that he or she was subjected to a warrantless search or seizure. *See United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *see also United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the Government to prove by a preponderance of the evidence that said search or seizure was lawful. *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *United States v. Delgado-Perez*, 867 F.3d at 250.

---

[4] On this score, Defendant again adopted at the hearing a factual posture different from the one asserted in his motion to suppress where he averred that he left his backpack on top of his motorcycle. (*See* Docket No. 50-1, ¶7). There was nothing presented at the suppression hearing developing such version of events, through cross-examination or otherwise.

Warrantless searches and seizures are *per se* unreasonable unless they fall within one of the "few specifically established and well-delineated exceptions" to the Fourth Amendment warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). The Fourth Amendment is enforced through the exclusionary rule by prohibiting the Government from using at trial evidence that constitutes the fruits of an unreasonable search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

**B.    Analysis**

### 1. The testimony of Villa-González that he observed Méndez in possession of controlled substances while fleeing is not credible.

A Fourth Amendment seizure occurs when the police "has in some way restrained the liberty of a citizen" through "physical force or show of authority." *Terry v. Ohio*, 392 U.S. 1, 19, n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *see also United States v. Sealy*, 30 F.3d 7, 9 (1st Cir. 1994). Thus, "[t]he protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops." *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011).

Under *Terry*, an officer may stop and briefly detain a person if the officer has reasonable suspicion based on articulable facts, and considering the totality of the circumstances, that criminal activity is afoot. *See United States v. Sanchez*, 817 F.3d 38, 42 (1st Cir. 2016). Reasonable suspicion as a concept defies exact definition, but this much we know: "it requires more than a hunch but less than probable cause." *United States v. Pavao*, 134 F.4th 649, 655 (1st Cir. 2025) (*quoting United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008). "[A] finding of reasonable suspicion must be premised

11

upon a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pontoo*, 666 F.3d 20, 27-28 (1st Cir. 2011) (*quoting United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 621 (1981)).

While the police may not, without more, detain a suspect merely because he is present in a neighborhood where violent crime or drug dealing is common, *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), presence in a high-crime area is a relevant contextual consideration in the *Terry* analysis when combined with other factors. *See United States v. Stroman*, 500 F.3d 61, 64 (1st Cir. 2007) (noting that the high-crime nature of the neighborhood is rationally relevant to the analysis although sometimes debated on policy grounds); *see also United States v. Harrington*, 56 F.4th 195, 201-02 (1st Cir. 2022). So is unprovoked flight upon noticing the police. *Illinois v. Wardlow*, 528 U.S. at 124; *United States v. Wright*, 582 F.3d 199, 210 (1st Cir. 2009).

If the Court finds that the initial interference with a defendant was justified, the Court must then ask, "whether an ensuing search was 'reasonably related in scope to the circumstances which justified the officers' initial interference.'" *United States v. Ivery*, 427 F.3d 69, 72 (1st Cir. 2005) (*quoting United States v. Nee*, 261 F.3d 79, 83 (1st Cir. 2001)). The reasonableness of a search following a *Terry* stop, in the form of a protective frisk or pat-down for weapons, depends on whether the officer is justified in believing that "the person is armed and dangerous to the officer or others." *United States v. Camacho*, 661 F.3d at 728 (*quoting United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004)).

Furthermore, the Fourth Amendment's prohibition against unreasonable seizures require that formal arrests be based on probable cause. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *United States v. McFarlane*, 491 F.3d 53, 56 (1st Cir. 2007) ("An arrest does not contravene the Fourth Amendment's prohibition on unreasonable seizures so long as the arrest is supported by probable cause."). "Law enforcement officers may effect warrantless arrests provided that they have probable cause to believe that the suspect has committed or is committing a crime." *United States v. Martinez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995) (citations omitted). "Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts", *Illinois v. Gates*, 462 U.S. 213, 232, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983), and considering the totality of the circumstances. *United States Jones*, 432 F.3d 34, 41 (1st Cir. 2007). The inquiry focuses on what the officer knew at the time of the arrest. *United States v. Brown*, 169 F.3d 89, 92 (1st Cir. 1999). "A *Terry* stop may lead to probable cause for arrest when 'the circumstances giving rise to reasonable suspicion' are combined with 'the developments that unfold[] during the Terry stop.'" *United States v. Dancy*, 640 F.3d 455, 461 (1st Cir. 2011) (*quoting United States v. Lee*, 317 F.3d 26, 32 (1st Cir. 2003)).

As an initial matter, there appears to be little controversy that the lawfulness of the intervention at issue here hinges on whether Villa-González had probable cause to believe, based on his alleged observations, that the offense of possession of controlled substances was committed by Méndez. In their filings, the parties cite *Terry v. Ohio*. But no developed argumentation is put forth on the question of whether Méndez' seizure was justified at its inception by reasonable suspicion that criminal activity was afoot.

Indeed, from the get-go, the Government argued that agent Villa-González went after Méndez because he observed the latter running with a bag of drugs in his hand. And in its post-hearing memorandum, the Government continues to assert that agent Villa-González had probable cause to arrest the Defendant based on said observations. The Government specifically contends that the agent observed the Defendant in possession of substances "believed to be of an illicit nature." (Docket No. 72 at 3).[5]

Similarly, the Defense has focused its efforts on challenging the credibility of the agent with respect to the alleged observations giving rise to probable cause. In a one-

---

[5] In its post-hearing memorandum, the Government briefly floated the alternative fallback theory of reasonable suspicion justifying the intervention as lawful under *Terry*. The United States says that

> notwithstanding a potential finding by the Court that the facts known to PRPB Agent Villa when Méndez-Rodríguez was seized did not constitute probable cause to arrest, reasonable suspicion was all that would have been necessary to effect an initial detention of the Defendant.

> At the time of the defendant's initial detention, officers had enough facts to justify an investigatory detention based on reasonable suspicion that the defendant had engaged in drug trafficking. Upon that detention, Agent Villa would have come into direct contact with the controlled substances held by the defendant while he fled from the drug point. This would have immediately morphed reasonable suspicion into probable cause to arrest.

(Docket No. 72 at 8-9). This position is problematic for two main reasons. First, if the observation (Ziplock bag full of cocaine in hand) giving rise to probable cause is eliminated from the equation, all that is left is an individual running in a high-crime area (assuming without deciding that La Perla Ward qualifies as such). As noted, unprovoked flight and presence in a high crime area are factors to be considered in the reasonable suspicion analysis but are not by themselves sufficient to meet the first prong of *Terry*. Second, even assuming favorably to the Government that those two factors justified a brief investigatory detention of Méndez, the Government has failed to advance a persuasive argument that a search in the form of a protective frisk or pat-down would have been warranted. No evidence was presented at the hearing to put the Court in a position to find that Villa-González would have been justified in believing that Méndez was armed and dangerous. *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005) ("It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met. To assess the legality of a protective frisk, a court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion.").

14

liner, the Defendant states: "In sum, the prosecution has not met its burden of establishing that police [sic] had reasonable suspicion to detain Mr. Méndez and, *a fortiori*, did not have probable cause to arrest and search him." (Docket No. 73 at 6). In view of the foregoing, I bypass any analysis that the warrantless seizure [6] of the Defendant was justified under *Terry v. Ohio*. Therefore, my task is to determine, after making an assessment of credibility, if the totality of the circumstances establish that Villa-González had probable cause to arrest Méndez.

The testimony of Villa-González that he observed Méndez running with a Ziplock bag in his hand containing what in his experience was controlled substances, is simply not credible. I was able to observe the agent's demeanor and inflection while testifying before me. He testified with ease on direct but was confronted with several mistakes and material omissions on cross examination. In addition to his story defying credulity, and the strong incentive Villa-González had to manufacture a narrative supporting his assertion of probable cause, there were also significant inconsistencies with the testimony (both internal and external) that are impossible for me to overlook.

As an initial matter, it is undisputed that the work plan to intervene at La Perla on October 8, 2024, did not include a mention of Méndez. The officers arrived at La Perla

---

[6] To be sure, Méndez was seized for the first time when agent Villa-González caught up to him and arrested him. *See California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)). In *Hodari D.*, a group of youths fled at the approach of an unmarked police car. 499 U.S. at 623. The police officers were suspicious, and they gave chase. *Id.* One officer followed the defendant, Hodari, and during the pursuit, Hodari tossed out a "rock" of crack cocaine. *Id.* at 623. The officer then tackled Hodari and handcuffed him. *Id.* Hodari moved to suppress the evidence relating to the cocaine, and the court denied the motion. *Id.* The admissibility of the evidence turned on whether the police seized Hodari at the moment the chase began or at the time of the tackle. The Supreme Court held that where a suspect fails to submit to an officer's approach and runs away, he is not seized until he is apprehended. *Id.* at 626. Hodari was therefore not seized until he was tackled.

in unmarked vehicles and in plain clothes. But they had their police issued identifications. There is no question that police presence was immediately noticed because consistent with prior police interventions at La Perla, individuals began running as soon as the police entered. Thus, it is clear to me that Méndez took off running on October 8, 2024, when the police showed up.

That said, I agree with the Defense that for me to assign credibility to Villa-González with respect to the critical observation I would have to believe that Méndez, who had taken steps to hide all of the contraband in his pockets (and we know this because this is where most of the contraband was seized following his arrest), decided to hold on to a bag full of cocaine baggies for the whole world to see. What's more, the Government is asking me to believe that having had many opportunities to discard the bag as he ran through a maze of abandoned structures full of garbage and debris, the Defendant made the conscious decision to hold on to the incriminating evidence. I find this proposition to be untenable. Judges should not be asked to believe as judges what we would not believe as persons. *See Landron-Class v. United States*, 86 F. Supp. 3d 64, 78 (D.P.R. 2015). Alternatively, the demonstration provided at the hearing of a clear plastic bag of the same size as the Ziplock bag seized that day, shows the implausibility of Villa-González' testimony that he was able to readily identify the contents of the bag as containing controlled substance. The way that Méndez was allegedly gripping[7] the bag,

---

[7] Even if I believed for a second that Méndez had the bag in his hand (which, as stated, I do not), I am not prepared to find that the bag was held, as the Government urges me to do, in a manner that provided an unobstructed view of the contents. That is simply not how anyone would hold a bag under the same circumstances.

and as he was swinging his arms while running, makes it impossible that anyone could readily see the contents with enough clarity in a fluid, rapidly evolving scenario, to conclude, or even suspect, that it was drugs.

Further, the credibility of agent Villa-González' version of the event is undermined by the testimony of fellow officer Pagán-Rojas. On cross examination, at least three material contradictions were established.  The first one—perhaps the most benign of the contradictions/omissions—is that as he ran behind Villa-González, Pagán-Rojas saw **two** individuals running towards them being chased by fellow officer Xavier Rivera. At no time during his testimony did Villa-González ever mention a second individual or fellow officer Xavier Rivera. Even though this omission could be characterized, standing alone, as inconsequential, there seems to be no valid reason to leave these facts out from the narration.

Second, Pagán-Rojas' testimony was that he first spotted Méndez running towards them when he was about 60 feet away. (Tr. 179). According to Pagán-Rojas, Villa-González was only approximately 10 feet ahead of him. If accurate, then Villa-González would have been about 50 feet away from Méndez when he first saw him, not 20 feet as he testified. This factual divergence goes to the heart of Villa-González' ability to observe the contents of the bag allegedly held by the Defendant.

More importantly, Pagán-Rojas did not see anything in Mendéz's hand as he ran towards them and before turning to go down the alleyway. In fairness, Pagán-Rojas did testify that he saw the bag in Mendéz's hand after Villa-González had already detained him and was holding on to him. Notably, this occurred after Pagán-Rojas stopped briefly to assist officer Xavier Rivera with his detainee and after losing sight momentarily of

Villa-González and Méndes. If there were reasonable explanations for these contradictions, the Government made no attempt to provide them neither at the hearing nor in its post-hearing submission.

To all of the above I add that the agent struggled to identify with precision the locations where the events transpired and did not include in his report rather important facts. These "mistakes" would not have impacted the credibility determination if they were the only problems with his testimony. But as discussed above, there are serious issues calling into question the veracity of the version offered by agent Villa-González anent the important facts that according to the Government established probable cause to arrest.

In sum, the testimony of Villa-González that he saw Méndez holding a clear plastic bag containing controlled substances and thus giving him probable cause to arrest is not credible. The version was internally inconsistent, and inconsistent in several respects with the version of at least one other law enforcement officer. The testimony was also uncorroborated as he is conveniently the only agent that saw Méndez running with a bag of drugs in his hands. *United States v. Toledo-Villanueva*, No. 23-cr-235 (RAM), 2024 WL 2720295, 2024 U.S. Dist. LEXIS 97159 at *18-20 (D.P.R. May 28, 2024) (finding that suppression was warranted and finding agent's testimony regarding plain view not credible because it was both inconsistent and uncorroborated.). At bottom, the agent's version had all the hallmarks of being contrived to make it fit the narrative of an arrest supported by probable cause. *See United States v. Lopez-Ortiz*, 648 F. Supp. 2d 241, 249 (D.P.R. 2009) (refusing to disturb magistrate judges credibility determination and characterizing agents' testimonies as contrived and incredible).

18

In view of the forgoing, I find that Méndez was unlawfully arrested on October 8, 2024. Therefore, I recommend that the evidence seized by the police from the Defendant's person at the time of his arrest be suppressed.

### 2. Méndez voluntarily relinquished his property interest in the backpack.

The Government contends that Méndez relinquished any right he might have had to contest the seizure of the items found in his backpack when he abandoned it prior to being arrested. According to the Government, the backpack was found "among the crumbling foundations of a residence, on top of piles of debris and trash . . . in an area open to public inspection near where Méndez-Rodríguez was arrested." (Docket No. 72 at 9). The Government says that Defendant did not show an intent to preserve the privacy of the backpack, nor did he claim ownership of it and its contents.

Méndez responds that the Government has failed to meet its burden to show that there was a valid exception to the warrant requirement when the police searched his backpack. He also maintains that he did not discard the backpack before his arrest or disclaimed ownership of it, which are, as he put it, quintessential forms of abandonment. Defendant further claims that the inability of the witnesses to specify where the backpack was recovered in relation to the arrest location, calls into question the Government's abandonment theory.

When moving to suppress evidence, a defendant "carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized." *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008) (*citing United States v. Salvucci*, 448 U.S. 83, 91-92, 100 S. Ct. 2547, 65 L. Ed. 2d

619 (1980)). However, a defendant said to originally have a reasonable expectation of privacy in the area searched or the item seized, may be deemed to have forfeited such expectation of privacy by incurring in voluntary acts of abandonment. *United States v. Wilkins*, 451 F. Supp. 3d 222, 227 (D. Mass. 2020); *see also United States v. Soto-Beniquez*, 356 F.3d 1, 36 (1st Cir. 2004) ("It is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property.").

"To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." *United States v. Bailey*, No. 08-10031-PBS, 2009 WL 524730, 2009 U.S. Dist. LEXIS 15870, at *4 (D. Mass. Feb. 26, 2009) (*quoting United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000)). The Court must look at the totality of the circumstances paying particular attention to explicit denials of ownership and facts showing physical relinquishment of property. *Id.* "There is also a subjective component . . . in the sense that a defendant who is trying to show that he did not abandon property must also demonstrate that he actually expected the item to remain private." *Id.*

Here, although Méndez has attempted to cast doubt as to the specific location of the backpack, and throws credibility jabs at agent Cardé-Rosado, one fact remains uncontroverted: the backpack was found in an abandoned structure, surrounded by

trash and debris, and exposed to the public.[8] Whatever subjective expectation (or hope) Méndez may have had that he would later be able to retrieve the backpack is irrelevant because by his conduct, and under the totality of the circumstances, he forfeited any objectively reasonable expectation of privacy by physically relinquishing possession of it. *See United States v. Arboleda*, 633 F.2d 985, 991 (2d Cir. 1980) ("Although [the defendant] may have intended to retrieve the package later, by placing it in an unprotected area he had abandoned it for Fourth Amendment purposes."); *see also United States v. Labelle*, No. 07-CR-20608, 2008 WL 1931875, 2008 U.S. Dist. LEXIS 35999, at *13 (E.D. Mich. May 2, 2008) (abandonment is not negated by the feeble hope of re-acquisition.).

The abandoned dilapidated structure where the backpack was found was readily accessible to the public or anyone passing by. And leaving an item in a public place is strong evidence of abandonment. *See California v. Greenwood*, 486 U.S.35, 40, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988); *see also United States v. Burnett*, No. 24-1443, 2025

---

[8] From the testimony of Cardé-Rosado and the photographic evidence presented, compare Exhibits 5 through 11 with Exhibits 28 and 29, there is no question in my mind that the backpack was found in the structure that is located down the path that was allegedly followed by Méndez and Villa-González during the chase. But even if it was unclear that such is the same path followed, Cardé-Rosado unequivocally testified he found the backpack in the structure depicted in Exhibits 28 and 29. (Tr. 143-44). Also, the Defense attacks the credibility of Cardé-Rosado as to the location of the backpack by highlighting that Pagán-Rojas testified he "saw nothing inside" the structure. (Docket No. 73 at 12). Such assertion mischaracterizes the testimony of Pagán-Rojas. He said that looked inside the opening as he was following his fellow officer. He saw nothing that called his attention at the time but clarified on re-direct that he was simply looking for his fellow officer. Thus, contrary to Méndez's contention, the testimonies of Cardé-Rosado and Pagán-Rojas can both be true. That Pagán-Rojas did not see a backpack inside the structure does not mean it was not there. I have not been presented by any clear and convincing evidence that Cardé-Rosado testified falsely.

WL 40850, 2025 U.S. App. LEXIS 312 (7th Cir. Jan. 7, 2025) (finding defendant abandoned his Fourth Amendment interest in his bags when he placed them in the bushes of an apartment building "and did not take active steps to guard them or give them to another for safekeeping); *United States v. Curran*, 638 Fed. Appx. 149, 153 (3d Cir. 2016) (concluding that appellant abandoned any reasonable expectation of privacy in the bags when he threw them over the storage facility's fence into a public area, walked away, and made no attempt to protect the bags or their contents from inspection.); *United States v. Figueroa*, No. 96-2065, 1998 U.S. Dist. LEXIS 26007 (1st Cir. Sep. 22, 1998) (defendant abandoned all expectations of privacy in box he stashed in neighbor's house while fleeing from the police where there was no evidence that he intended to retrieve it at a later time or that he obtained permission from the owners of the residence to leave box with them for safekeeping); *United States v. Morgan*, 936 F.2d 1561, 1570 (10th Cir. 1991) (defendant abandoned reasonable expectation of privacy in a bag when he discarded it in a backyard that was accessible to the public, and made no attempt to retrieve it.).

Moreover, although Cardé-Rosado never questioned Méndez about the backpack, there is also no evidence tending to show that Defendant claimed ownership at any time after his arrest or asserted a privacy interest in it. *See United States v. Hill*, No. 24-cr-20521, 2025 WL 1684233, 2025 U.S. Dist. LEXIS 114324, at *25 (E.D. Mich. Jun. 16, 2025) (noting that a fact that favored a finding of abandonment was that Defendant did not give a clear signal asserting his privacy or conveying that he maintained a privacy interest in the backpack). Granted, his personal identification documents were found

inside, validating the assertion of a subjective expectation of privacy in the bag.[9] But that fact was only revealed after the search of the backpack was performed. Prior to the search that the agent treated as a "finding" of abandoned property, there was nothing indicating that the backpack contained the personal identification documents of an individual.

The cases cited by the Defense, *United States v. Ramos-Ramirez*, No. 22-50042, 2023 WL 5925902, 2023 U.S. App. LEXIS 24122 (5th Cir. May 10, 2023) and *United States v. Vining*, 675 F. Supp. 3d 778 (E.D. Mich. 2023), are factually distinguishable. In *Ramos-Ramirez*, for example, the defendant tossed his jacket over the fence of his mother's property. In doing so, the Fifth Circuit found that he did not manifest an intent to discard it and a continued interest in keeping its contents private. Contrariwise, Méndez left the backpack in a public place accessible to anyone passing by.

In *Vining*, after being initially approached by agents at a bus station, Defendant set his bag down and walked away. The Court observe that to show abandonment, a defendant must do more than just walk away from something as private as a suitcase; walking away alone does not provide a conclusive indication of defendant's intent. 675 F. Supp. 3d at 792-93. But here, Méndez did more than just walk away from his backpack. He left it in a location where, by all accounts, could be accessed by anyone thereby defeating any intent to keep it private or safe from being grabbed and opened. *See United States v. Hill*, 2025 U.S. Dist. LEXIS 114324, at *20-21 (discussing caselaw holding that

---

[9] I am not crediting Cardé-Rosado's absurd statement that in his experience as a police officer it is "common" for people to discard or throw away documents such as passports, social security cards or driver's licenses. (Tr. 150-51.)

a crucial factor in the abandonment analysis is the location where the defendant places an item and explaining that by dropping the item on a public street where it can be damaged, lost or stolen, a defendant forfeits his right to exclude others and thus has no expectation of privacy). "The location of Defendant's backpack on a public street is therefore consistent with abandonment; Defendant's actions and the surrounding circumstances do not show that he maintained a subjective expectation of privacy in his backpack based on where he placed it." *Id.* at *21; *see also United States v. Oswald*, 783 F.2d 663, 666-67 (6th Cir. 1983) ("[P]rivacy expectations . . . will vary with the location of the property.").

For the above-outlined reasons, I find that Méndez forfeited any expectation of privacy he had over his backpack and that the Government met its burden to show abandonment. I thus recommend that the request for suppression of the contents of the backpack be denied.

## V.    CONCLUSION

For the reasons stated, I recommend that Méndez's motions to suppress (Docket No. 50) be GRANTED in part and DENIED in part.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 22nd day of October, 2025.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE
